PHILLIP A. TALBERT
United States Attorney
VICTORIA L. BOESCH
PHILIP A. SCARBOROUGH
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA  95814
Telephone:  (916) 554-2700

Attorneys for the Postmaster General

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THEODORE W. MORT, an individual,<br><br>                                    Plaintiff,<br><br>                    v.<br><br>LOUIS DEJOY, POSTMASTER GENERAL, UNITED STATES POSTAL SERVICE,<br><br>                                    Defendant. | CASE NO.  1:19-cv-00652-JLT-SKO<br><br>DEFENDANT POSTMASTER GENERAL'S TRIAL BRIEF<br><br>JUDGE:        Hon. Jennifer L. Thurston<br>COURT:        Courtroom 4, 7th Floor<br><br>TRIAL:        August 15, 2022 |

DEFENDANT POSTMASTER GENERAL'S TRIAL BRIEF

1

## I.   <u>INTRODUCTION</u>

Plaintiff Theodore Mort, a former Postal Inspector, asserts employment discrimination claims against the United States Postal Inspection Service (USPIS) alleging retaliation and disability discrimination.  His claims concern events from late 2011 until his March 2013 termination.  He challenges the decisions (1) to place him on paid administrative leave during an Office of the Inspector General (OIG) investigation into his conduct, (2) to send him for a psychological fitness-for-duty examination, and (3) to terminate his employment.  His retaliation claim arises under Title VII and his disability discrimination claim under the Rehabilitation Act.  Those claims will be tried to a jury, except that the Court will determine what, if any, equitable remedies such as back pay Mort can recover.  *See Lutz v. Glendale Union High School*, 403 F.3d 1061, 1069 (9th Cir. 2005); Dkt. 112 at 23.

USPIS is the law enforcement arm of the United States Postal Service.  Postal Inspectors are federal law enforcement officers who investigate violations of mail-related laws, enforcing the laws that defend the nation's mail system from illegal or dangerous use.  They investigate postal crimes, working with prosecutors on criminal cases resulting from such investigations.  Because their duties include testifying in court, their credibility must be unimpeachable.  Mort was terminated from his position as a Postal Inspector because he misled a California Superior Court to obtain a restraining order against his supervisor and because he filed misleading police reports with the Fresno Police Department.  Mort's deceptive conduct rendered Mort unqualified to work as a Postal Inspector.

## II.   <u>STATEMENT OF FACTS</u>

Postal Inspectors are law enforcement officers, so they carry a firearm when on duty and they often receive calls outside normal business hours, on nights and weekends.  It is part of a Postal Inspector's job to work irregular and unscheduled hours in addition to the standard 40-hour workweek. Each Postal Inspector is required to work many extra night and weekend hours – a minimum of two extra hours per regular workday.  To compensate them for working and being available for these extra hours, Postal Inspectors receive Law Enforcement Availability Pay (LEAP pay).  Postal Inspectors receive an additional 25 percent of their salary as LEAP pay.

---

On September 4, 2011 (the Sunday of Labor Day weekend), Stockton Postal Inspector Jennifer Hiland received a call shortly after 2:00 a.m. about three suspects found with stolen mail and counterfeit mailbox keys in Fresno.  Because Mort was the Postal Inspector for Fresno, Hiland attempted to contact Mort via his work and personal cell phones.  Mort did not answer either phone.

### A.  Gadsden tried to find Mort so he could participate in interviews for a case that Mort would investigate.

When Hiland could not reach Mort as the Fresno Postal Inspector on September 4, 2011, she contacted his supervisor, Team Leader Mack Gadsden (also based in Stockton).  Gadsden told Hiland that he would accompany her to Fresno to interview the suspects.  The two then drove from Stockton to Fresno.  Mort was the only Postal Inspector in Fresno at this time, and Gadsden expected Mort to conduct the investigation growing out of these interviews.  He also knew that Mort had information regarding similar investigations in Fresno involving counterfeit mail keys.  For these reasons, Gadsden thought it important to have Mort attend the interviews if possible.  Gadsden called Mort during the drive from Stockton to Fresno but was not able to reach him.  Gadsden then instructed Hiland to stop at Mort's residence on the way to the Fresno Police Station.  At around 5:30 a.m., they drove up to Mort's house in Fresno.  Gadsden went to the front door and knocked, but there was no answer.  He then went through an unlocked side gate around to the back door and knocked on the back door and window.  Again, there was no response.  Not able to reach Mort, Gadsden and Hiland proceeded to the Fresno Police Station and interviewed the suspects.  After those interviews, Gadsden felt uneasy about not being able to contact Mort.  He therefore had Hiland drive by Mort's house again on their way out of town.  At around 7:30 a.m., Gadsden again knocked on Mort's door, again with no response.  The two drove back to Stockton.  Gadsden was carrying his USPIS-issued service weapon and his law enforcement credentials during these events on September 4, 2011.

### B.  Instead of apologizing for being unavailable and failing to respond to messages, Mort complained about his workload and accused Gadsden of trespassing.

Shortly before 8 a.m. on September 6, 2011 (the Tuesday after Labor Day), Gadsden called Mort.  He asked Mort if he had received Gadsden's messages, Mort confirmed that he had.  Gadsden instructed Mort to come meet with Gadsden in his office.  Later that morning, Mort and Gadsden met in Gadsden's office.  Mort expected that Assistant Inspector in Charge (AIC) Sally Diaz (Gadsden's

immediate superior) would also be at the meeting.  But Diaz had called to let Gadsden know that she had been called away to a different meeting.  During the ensuing meeting between Mort and Gadsden, Mort first complained about his workload.  Then, Mort became agitated and walked out of Gadsden's office, stating he was not feeling well.  Gadsden asked Mort to come back and finish their conversation.  Mort complied with Gadsden's request, but after returning he called Diaz and left her a voicemail message stating that he felt threatened because Gadsden had a gun and was not allowing Mort to leave his office.  Both Mort and Gadsden were armed at the time, as both were on duty.  Mort then told Gadsden that he was upset about Gadsden coming to Mort's residence on Sunday, and that he felt Gadsden violated his rights by trespassing on his property.  Mort told Gadsden that he was not feeling well and was going to take a sick day and left Gadsden's office.

After the meeting with Gadsden, Mort called San Francisco Inspector in Charge (INC) Adam Behnen.  Mort demanded that Behnen report Gadsden to the United States Postal Service's Office of the Inspector General (OIG) because Gadsden trespassed on his property.  Mort told Behnen that he had not been home at the time, but that a neighbor had seen people at Mort's house.  In an excited and irrational tone, Mort stated that Gadsden had come on his property without a search warrant.  Behnen explained that Gadsden did not need a warrant because he was not investigating a crime, making an arrest, or searching for evidence – Gadsden had been checking to see if Mort was okay because Mort did not answer his phone.  In response to Mort's questions, Behnen told Mort that Behnen was not going to report Gadsden to the OIG or the Fresno Police Department but that Mort was free to do so.

Later that same day, Behnen spoke to Mort again, scheduling a meeting with him for the following afternoon to discuss what had happened with Gadsden.  Mort stated that he felt stressed and so might not be able to make it because he might take sick leave.  Behnen told him to get a doctor's note if he was going to take sick leave and that, if he could not make it the next day, Behnen still wanted to talk in person when Mort returned to work to get the facts.

### C. __Mort submitted a complaint to the USPS OIG because Gadsden had gone in Mort's backyard and knocked on his doors and windows while Mort was not home.__

That evening, Mort submitted a complaint to the OIG alleging misconduct by Gadsden.  This complaint identified Gadsden as a "USPIS Team Leader/Postal Inspector."  It stated that Gadsden had

entered Mort's backyard "while in performance of Gadsden's official duty with the USPIS."  Mort

claimed that "an anonymous neighbor" notified him of the incident.  Mort went on to assert that

"Inspector Gadsden Jr violated the CA Penal trespassing/False imprisonment codes and conducted a

search w/o a Federal/State Warrant in violation of the reporting Inspector's civil right against

unauthorized search."

Mort's complaint also advised the OIG that Mort had been directed to meet with San Francisco

Inspector in Charge (INC) Adam Behnen the next day (Wednesday September 7, 2011).  It also

suggested that Mort had told Behnen that he might miss the meeting "due to stress of the appearant [sic]

failure to act/report by the INC of supervisory misconduct," indicating that Behnen had instructed him to

submit a doctor's note.

The next day, Mort sent an email to Behnen stating that he was going to the hospital.  Mort took

sick leave related to stress from September 6 to 12 and took annual leave from September 13 to 15.

Mort filed an additional OIG complaint against Gadsden on September 15.  He returned to work on

Friday September 16, 2011.

**D.     When INC Behnen met with Mort to address his concerns, Mort jumped from topic to topic in a loud, angry tone – making no sense.**

The day Mort returned to work Behnen met with him.  Mort complained that Gadsden had

trespassed on his property without a search warrant.  Behnen again explained that Gadsden was

checking on Mort and wanted Mort to accompany him to interview suspects.  Mort responded

dismissively that Behnen did not understand the law and issues of curtilage.  Behnen again tried to

explain that Gadsden was not conducting a criminal investigation or making an arrest.

Mort began to make illogical statements that were difficult to follow.  Behnen expressed concern

that Mort was very angry and raising his voice.  Behnen asked Mort if he thought he could work with

Gadsden.  Mort insisted that Gadsden would not be around much longer because the OIG investigation

would find that Gadsden trespassed on Mort's property.

Mort also said that Gadsden had damaged Mort's windows.  Behnen asked how he knew that

Gadsden had damaged the windows, and Mort said he had neighbors.  Behnen asked Mort to please tell

him if neighbors had seen Gadsden damage Mort's windows.  If that was so, Behnen explained, he

would report the incident to the OIG because that would be misconduct.  When Behnen asked Mort if his neighbor had seen Gadsden damage Mort's windows, Mort said "I see what you are doing, you are turning this back around on me," "Oh you're good, you're good."

Behnen found the conversation bizarre.  Mort jumped from topic to topic, making various irrational statements.  These included Mort talking about how he had researched Gadsden after finding out that Gadsden would be his team leader, learning that Gadsden was a boxer.  Mort went on to say that boxers are fighters by nature, and that Gadsden was a fighter.

Mort continued to be loud and disrespectful to Behnen.  Behnen reminded Mort that Behnen was INC, and he asked Mort to be more polite and respectful.  Mort responded: "You put your pants on just like I do."  Behnen asked Mort to leave his office.  Behnen then had to help Mort find his car.

Behnen was concerned about Mort because of the erratic way he had behaved during the Friday September 16 meeting.  That same day, Behnen put Mort on paid administrative leave pending adequate medical documentation that confirmed Mort could return to work.

E.     **The OIG found Mort's complaint did not warrant an OIG investigation, so Behnen arranged for a Team Leader from Los Angeles to investigate it.**

A week and a half later, the OIG declined to investigate Mort's complaint against Gadsden, referring it back to Behnen's office.  Behnen requested that someone from the Los Angeles division investigate it rather than assign a San Francisco investigator.  He did this to ensure an independent and impartial investigation.  Behnen was concerned about Mort's allegation that Gadsden had broken Mort's window intentionally.  Behnen thought such behavior would likely warrant disciplining Gadsden.  The Los Angeles management team assigned Los Angeles Team Leader Rafael Nunez to investigate.

On October 21, 2011, Nunez submitted an investigation report to Behnen for his consideration and decision as to whether any disciplinary action against Gadsden was warranted.  After reviewing that report, Behnen concluded that it failed to substantiate Mort's allegation that Gadsden had broken Mort's window.  Behnen noted that investigators had canvassed Mort's neighbors, and none witnessed Gadsden breaking a window.  In addition, the investigation showed that the window at issue had no area of apparent impact where someone hit it and broke it – it had a crack identified by a repairman as a "stress crack" that could have been caused by Mort's house settling.  And the investigation uncovered evidence

that Mort was pursuing a lawsuit against the builder of his home concerning damage to his house caused by settling.

**F.** **Mort filed complaints with the Fresno Police Department suggesting that Gadsden was armed and violent.**

Several days after his September 16 meeting with Behnen, Mort filed a report with the Fresno Police Department. That report stated that an anonymous neighbor told Mort "a strange black male was banging very loud on windows and the door" of Mort's house in the early morning on September 4, 2011, and that he "went into the side gate…in violation of Trespassing." Mort wrote that he found "that the upper right corner of a window was cracked due to apparent stress." He stated that Gadsden "a fellow employee" called Mort about "a work related incident occurring at 2-3am" on that date and was unable to reach Mort. He reported that Gadsden "beat on my doors/windows in appearant [sic] anger/attempt to enter my house." Mort also asserted that "Gadsden had submitted a written statement (admitting the crime(s))" and that "Gadsden may have broken the window in an appearant [sic] fit of rage/anger or an attempt to gain entry into my residence unable to open doors."

Mort did not explain in this Fresno Police Department police report that (1) Gadsden was a federal law enforcement officer (as was Mort) and that (2) Gadsden was looking for Mort on that date so Mort could help interview suspects at the Fresno Police Department.

About a week later, Mort filed another police report. In this report, Mort reported receiving 5-10 phone calls from Gadsden since the September 4 incident. Mort then wrote "I need to obtain a 'Restraining Order' with the assistance of the Fresno Police Dept because I fear for the safety of myself, neighbors and protection of my/our property due to Gadsden being a former boxer (propensity to engage in violent acts) and known to be armed with a firearm."

Again, Mort failed to mention Gadsden was a federal law enforcement officer (as was Mort). Mort also failed to report Gadsden carried a firearm as part of his law enforcement duties (as did Mort).

**G.** **Mort sought a restraining order against Gadsden by suggesting to the court that Gadsden was dangerous and violent.**

Another week later, on October 4, 2011, Mort filed a "Request for Orders to Stop Harassment" with the Fresno Superior Court. Mort indicated that he filed the request because "I was hurt (physically or emotionally) by" Gadsden. He identified Gadsden as a "Coworker residing in Elk Grove, CA with an

office in Stockton, CA." Asked if Gadsden had "commit[ed] any acts of violence or threaten[ed] to commit any acts of violence against you," Mort answered "yes." He described those acts/threats as: "On Sept 4, 2011, Gadsden trespassed (while armed with a firearm) on my residence property (closed/latched back yard) and beat on my doors/windows causing a window to crack." Asked if Gadsden had "engage[d] in a course of conduct that harassed you and caused substantial emotional distress," Mort answered "yes." He described that course of conduct as: "Since Sept 4, 2011, Gadsden has made numerous phone calls and e-mails to me as reported to the Fresno Police Dept."

Mort then asked the court to order Gadsden: (1) not to do the following to Mort "harass, attack, strike, threaten, assault (sexually or otherwise), hit, follow, stalk, destroy personal property, keep under surveillance or block movements," (2) not to contact Mort (directly or indirectly), and (3) to stay at least 100 yards away from Mort and his home, workplace, and vehicle. The request also asked the court to order Gadsden "to be prohibited from owning, possessing, purchasing, or receiving, or attempting to purchase or receive firearms and to sell or turn in any guns or firearms that he or she controls."

Mort requested that the court make these orders immediately, so that they would last until the hearing. Asked to explain why he needed the orders immediately, Mort wrote: "I fear for the safety of myself, neighbors and property until the Fresno Police Dept conducts their criminal investigation(s) and court(s) can afford me protections as a crime victim."

Mort asked the court to waive the filing fee because Gadsden had "used or threatened to use violence against me, has stalked me, or has acted or spoken in some other way that makes me reasonably fear violence." He also asked the court to order the sheriff or marshal to serve Gadsden because Gadsden had "stalked me or threatened me with sexual assault."

Mort's request for an immediate restraining order against Gadsden badly misrepresented the facts. Mort failed to tell the court that Gadsden was a federal law enforcement officer whose duties required him to carry a gun. Mort failed to tell the court that Mort was also such a federal law enforcement officer. Mort failed to tell the court that Gadsden was Mort's supervisor. Mort failed to tell the court that Gadsden had visited Mort's home in the course of Gadsden's official duties. And Mort mischaracterized Gadsden's actions as violence or threats of violence.

**H.** **The Fresno Superior Court granted a temporary restraining order against Gadsden based on Mort's misrepresentations.**

The next day, the court granted Mort's request. Judge Rosemary McGuire ordered that for the next 15 days until a hearing, Gadsden could not contact Mort (directly or indirectly). It required Gadsden to stay 100 yards away from Mort – and from Mort's home, vehicle, and "jobs or workplaces." And it prohibited Gadsden from possessing a firearm, requiring him to sell or turn in to police any firearms that he possessed within 24 hours of being served with the order.

Assistant United States Attorney Alyson Berg appeared at the hearing for the United States Postal Inspection Service to inform the court that the state court was not the proper venue because Mort and Gadsden were both federal employees of USPIS and Mort's claim was work related. Judge McGuire dissolved the previously issued temporary restraining order. The case was removed to federal court and dismissed.

**I.** **Behnen asked the OIG to investigate Mort's conduct in filing the police reports and restraining order request.**

Three days after Mort filed his "Request for Orders to Stop Harassment," on October 7, 2011, Behnen submitted a referral to the OIG requesting an investigation into potential misconduct by Mort. The alleged misconduct included Mort making misleading statements to the court in his application for a restraining order and to the Fresno Police Department in police reports.

About a week after that, Behnen placed Mort on paid administrative leave pending results from the OIG investigation into Mort's conduct and a decision by USPIS about what, if any, agency action should follow from those results.

Approximately two weeks later (in late October 2011), Mort contacted an EEO counselor for the first time regarding his allegations of discrimination. He formally filed an EEO complaint in early December 2011. Dkt. 1 at 14.

**J.** **Mort refused to provide key information as the OIG investigated Mort's conduct.**

OIG Special Agents Robert Musti and Gordon Thompson conducted the OIG investigation into Mort's conduct. They interviewed Mort, Behnen, Vincent, Gadsden, and several others, gathered various documents, and canvassed Mort's neighbors. Before their November 2011 interview of Mort, they advised Mort that he had the right to remain silent if his answers would incriminate him. During

that interview, Mort refused to identify the neighbor that Mort claimed had observed Gadsden beating very loudly on the doors and windows of Mort's house and refused to say where he was on the morning of September 4, 2011.  In mid-March 2012, the OIG provided their report to Behnen.

About a month later, in mid-April 2012, Musti and Thompson interviewed Mort again.  The purpose of the second interview was to again ask Mort for answers to the two questions he had previously refused to answer about the neighbor's identity and Mort's whereabouts.  Prior to this interview, Mort signed an administrative warning informing him of his duty to cooperate.  That warning advised Mort that he would be asked specific questions and that he had a duty to respond to them.  It also advised that disciplinary action up to and including dismissal could result if he refused to answer questions.   During the interview, Mort would not reveal where he was on the morning of September 4, 2011, stating only that he was within 60 miles of his house.  Mort again refused to give the name of the neighbor.

   At one point during the April 2012 OIG interview, Mort began talking about a shooting involving an Immigration and Customs Enforcement (ICE) agent that had happened in Los Angeles. That incident involved a workplace argument that escalated into an ICE agent shooting his supervisor.

### K.   Galetti met with Mort and Mort again invoked a workplace shooting where an ICE agent shot his supervisor.

In early June 2012, Assistant Inspector in Charge (AIC) Anthony Galetti and acting AIC Melisa Llossa met with Mort for a pre discipline interview during which Mort was allowed to review and respond to the OIG report.  Mort came to the interview appearing disheveled and like he had not bathed recently.  Galetti observed that Mort communicated in a rambling manner, appearing unable to maintain a coherent train of thought.  Galetti noted that this was a significant change from Mort's manner of communicating in the past.  During this interview, Mort again referred to a February 2012 shooting that occurred in Long Beach, CA.  The incident involved an on-duty argument between an armed ICE agent and his supervisor.  The ICE agent shot his supervisor multiple times.  Ultimately, the agent was killed by another ICE agent in the office.  Galetti was disturbed by Mort's reference to this incident.

A couple weeks later, Mort sent a complaint to the office of Congressman Devin Nunes. Included with Mort's complaint was a copy of a news article about the ICE agent shooting.  Mort had

written on the copy "An example of the worst case that occurs."

**L.** **Based on Mort's repeated invocation of a workplace shooting and his erratic behavior, Galetti and Villanueva requested a fitness-for-duty exam for Mort.**

In early July 2012, concerned about Mort's safety and the safety of his coworkers, Galetti prepared a Request for Fitness for Duty Examination. In that request, Galetti observed that Mort had demonstrated behavior indicative of potential workplace violence. Galetti noted Mort's argumentative behavior towards his supervisors and irrational thinking in connection with the complaints Mort had filed. And he pointed out Mort's repeated references to the Long Beach ICE shooting – a violent act committed by a subordinate on a supervisor. Mort's work as a law enforcement officer required him to carry a firearm, and Galetti noted that this could provide Mort a direct opportunity to engage in violence like that to which he had repeatedly referred. Because the potential harm was so severe, Galetti recommended that Mort be sent for a fitness-for-duty examination.

San Francisco Inspector in Charge Oscar Villanueva, who had taken over that job from Behnen by this time, approved Galetti's request. The request then went to United States Postal Service Medical Director Dr. Bruce Dixon. Dixon made the decision to send Mort for the examination, which consisted of an initial physical exam and then psychological evaluations by psychologist Dr. Neil Hibler and psychiatrist Dr. Martin Allen. Dixon approved the examinations because he believed there was justifiable doubt concerning Mort's ability to perform the duties of a Postal Inspector satisfactorily and safely. After Dixon's approval, Villanueva ordered Mort to attend the examinations.

**M.** **Independent evaluators Dr. Hibler and Dr. Allen recommended that Mort be assigned to a trial period of limited duty without a firearm.**

Mort first attended a physical medical examination in Fresno, CA. Later, in mid-October 2012, Mort traveled to Washington, DC for psychological examinations first with Dr. Hibler and then with Dr. Allen. Dr. Hibler and Dr. Allen were asked to assess Mort's fitness for the duties of an armed law enforcement officer. Dr. Hibler prepared a report of his findings, as did Dr. Allen. Dr. Allen incorporated Dr. Hibler's insights into his report and recommendations. Both Dr. Hibler and Dr. Allen recommended that Mort be returned to limited duty. This limited duty included not assigning Mort to any aggressive law enforcement activities or duties that might expose him to stressful circumstances. It also included Mort not carrying a firearm. If Mort were able to function well without conflict and

arguments with his co-workers and superiors, then he could be considered for return to full duty (including arming) in 1 to 3 months.

**N.   USPIS terminated Mort's employment because of his lack of candor in police and court filings and his failure to cooperate in the OIG investigation.**

Meanwhile, Galetti prepared a recommendation regarding discipline in connection with the OIG's investigation into Mort's misconduct.  In late November 2012, Galetti issued a Notice of Proposed Removal.  This notice explained that Mort made misleading, material, and unjustified omissions in reports to the Fresno Police Department and his request for a restraining order relating to the events of September 4, 2011.  It also observed that Mort had failed to cooperate during the OIG's investigation into the matter by refusing to answer questions about the identity of the neighbor who he claimed saw Gadsden banging very loudly on his doors and windows and refusing to answer questions about his whereabouts and who he was with.  The notice also noted that Mort's misrepresentation of material facts in police and court filings meant that he would be exposed to cross examination about his lack of candor.  This meant he could no longer appear as a witness for USPIS during a hearing or trial and therefore could no longer fully discharge the duties of a Postal Inspector.  And Mort had failed to take responsibility for his conduct or to indicate that he would behave differently in the future.  His improper conduct damaged his reputation and that of the agency.  Accordingly, the notice proposed Mort's removal from service.

In mid-December 2012, Galetti met with Mort and provided him with a copy of the Notice of Removal.  Then, in late February 2013, Mort met with Galetti and others for a mediation.

In mid-March 2013, USPIS Inspector in Charge Oscar Villanueva issued a Letter of Decision terminating Mort's employment as a Postal Inspector.  Villanueva noted that he had considered the OIG report investigating Mort's alleged misconduct as well as Nunez's report investigating Gadsden's alleged misconduct.  Copies of these documents had been provided to Mort, and his attorney, and Mort had been given an opportunity to respond to those reports.  Mort's attorney had also submitted a response to the Notice of Proposed Removal.  Villanueva concluded that Mort's lack of candor and failure to cooperate with the OIG investigation warranted Mort's removal from his USPIS position.

**O.   Mort testified inaccurately during EEOC proceedings about prior investigations into his misconduct.**

During an EEOC administrative hearing in 2016, Mort testified under oath before an Administrative Law Judge.  Mort testified about a four-month suspension that he received during his time working as a special agent with the United States Office of Inspector General for Tax Administration (Treasury OIG).  He testified that he held the Treasury OIG job from 2002 to 2007, then became a United States Postal Inspector beginning in July 2007.  He related that he had received a four-month suspension while at Treasury OIG after an incident during which he found the mother of his child, who was pregnant at the time, with narcotics.  He described the incident.  He then testified that he had been suspended for associating with a disreputable person, misuse of government-issued handcuffs to detain her during the incident, and destruction of evidence (drugs that he flushed down the toilet).  Dkt. 36-4 (Boesch Decl. Exh. A (EEOC Transcript 40:20-42:1; 158:22-159:5)).

USPIS agency counsel cross examined Mort about the four-month suspension with a document from Mort's personnel file.  Counsel showed Mort a Treasury Department Form 50 reflecting that Mort had been disciplined for conduct unbecoming a federal law enforcement officer, unauthorized access to the Treasury Enforcement Communications System, and providing false statements in the nature of official interests.  Mort testified that he believed he had only received one page of that document and that he had stated what he remembered as the reason that he was suspended for four months.  Dkt. 36-4 (Boesch Decl. Exh. A (EEOC Transcript 159:6-10, 22-23; 160:3-7; 160:16-161:3-17)).

When asked about other discipline during his time at the Treasury Department, Mort testified that there had been a complaint, but no other discipline.  He testified that it had been alleged that he used Treasury Department time to conduct activities related to his transfer to Postal, but that he met with OIG agents and explained that he had used leave.  After providing that information, Mort testified, he never heard anything about the complaint.  Mort testified that this occurred in the process of him leaving Treasury and going over to Postal.   Dkt. 36-4 (Boesch Decl. Exh. A (EEOC Transcript 42:2-42:23)).

**P.   USPIS later discovered that two separate Treasury OIG investigations concluded that Mort made false statements.**

Unbeknownst to USPIS, Mort had omitted critical facts regarding the first Treasury OIG investigation and lied about the focus of the second investigation.

From June 2004 to February 2005, Treasury OIG Special Agent Shane Gilmore investigated allegations of Mort's misconduct.  The investigation concluded that Mort engaged in serious misconduct.  That misconduct included associating with a disreputable person and misuse of government-issued handcuffs – the reasons for which Mort testified that he had been suspended.  Dkt. 36-4 (Boesch Decl. Exh. A (EEOC Transcript 40:20-42:1; 158:22-159:5)), Dkt. 36-11 (Boesch Decl. Exh. H (Report of Investigation summary)).  But it also included several other types of misconduct.  Those were:

- physical assault causing injury (using excessive force while trying to handcuff a person with whom he was having a personal argument),
- providing false and misleading statements to investigators,
- using a restricted, law enforcement database (TECS) to conduct unauthorized queries,
- failing to properly secure his government assigned firearm, and
- making false or misleading statements under oath during an interview.

*See* Dkt. 36-11 (Boesch Decl. Exh. H) at 4-9.  The Report of Investigation also reflected that Mort had resigned from an earlier job with the New Orleans Police Department while under investigation for neglect of duty.  That neglect of duty related to Mort failing to perform a basic investigation, causing an innocent person to spend three weeks in jail.  *Id.* at 10.  The Report also stated that AUSA Ben Wagner had advised that Mort's false statements were a *Henthorn/Giglio* issue.  This would require disclosure of the report to defense counsel if Mort testified for the government in a prosecution because it called Mort's credibility into question.  *Id.* at 3.

Mort received a four-month suspension because of the 2004/2005 investigation findings.  This was part of a Last Chance Settlement Agreement through which Mort avoided a proposed termination of his employment.  In that agreement, Mort acknowledged that a reasonable person could find the investigation's allegations supported by a preponderance of the evidence.  And Mort promised not to engage in any serious misconduct in the future.  Dkt. 36-18 (Boesch Decl. Exh. O).

From October 2006 to April 2007, the Treasury OIG investigated allegations that Mort made false statements and misused official time.  The investigation concluded that Mort made false statements concerning his whereabouts – going to a coffee shop and/or home when he had indicated he would be

elsewhere working.  It also concluded that statements made on Mort's agency time reports did not match Mort's case work documentation.  In addition, the investigation concluded that Mort had misused official time, going to a coffee shop and home frequently on official time.  Mort was unable to provide evidence of work he had conducted during that time.  Dkt. 36-12 (Boesch Decl. Exh. I).

In February 2007, Mort was interviewed by TIGTA Special Agent Kelly Sopko as part of that investigation.  An attorney representing Mort attended the interview via speakerphone.  The interview memo shows that Mort was asked about leaving the office to go to a coffee shop and/or home, his statements regarding his whereabouts, and discrepancies in his agency documentation regarding his work (including charging time to an investigation that was already closed).  The interview memo says nothing about Mort using official time to apply for a Postal Inspector job.  Dkt. 36-13 (Boesch Decl. Exh. J).

### Q.    **Mort failed to disclose to USPIS that he was Gigio-impaired and so unqualified to be a Postal Inspector.**

Mort transferred to the Postal Inspection Service in July 2007.  Mort claims that he told USPIS about the four-month disciplinary suspension he received while working at Treasury.  But he has never claimed that he told USPIS that Treasury OIG concluded that Mort made false statements, including false statements under oath.  And he never claimed that he told USPIS that he was *Giglio*-impaired in 2007 when he applied to be and was hired as a Postal Inspector.  Mort himself explained the relevance of this information at his deposition:

> Q.    Do you recall that the OIG report substantiated allegations that you had provided false or misleading statements to an assistant special agent in charge?
>
> A.    No. I don't see -- that's totally out in left field. The reason being is because there's no way that -- if that was substantiated, then there's no way I would have avoided termination. It would have been an automatic unconditional termination, because if that was actually substantiated, which I don't -- I don't recall anything like that even being in -- they wouldn't have approved me to go back to work. I would have never been able to go to the Postal Inspection -- I would have never got out of the four-month suspension. I would have just been terminated because I wouldn't have been able to do my job. That doesn't make -- you're saying they substantiated false statements, which can't be the case because we wouldn't be here right now if that was the case. I would have been --
>
> Q.    Why is that?
>
> A.    Because I don't believe the Treasury Department would have let me back to work if that was actually a substantiated allegation.

Q.      Why?

A.      Because I wouldn't be able to testify if that was substantiated. I would be Giglio'd.

Dkt. 44-2 (Boesch Reply Decl. Exh. Q (Mort January 4, 2021 Deposition Transcript at 261:16-262:17)).

Although Mort knew that his *Giglio*-impaired status rendered him unqualified to be a Postal Inspector, he failed to advise USPIS of this crucial fact before or during his USPIS employment.

### III.      PROCEDURAL BACKGROUND

Mort first contacted an EEO counselor in late October 2011 and filed his first formal EEO complaint in early December 2011.  In that complaint, Mort alleged discrimination based on his race (Caucasian) and his color (white) and retaliation for filing a non-EEO report with the OIG regarding Mack Gadsden.  He later amended the complaint to allege discriminatory harassment based on race, color, and retaliation for filing the discrimination complaint.  Mort filed a second formal EEO complaint in May 2013 alleging retaliation for EEO activity.

In August 2016, Administrative Law Judge Katherine Kruse held a hearing on Mort's claims in which Mort and various other witnesses testified.  In April 2017, Judge Kruse entered an order ruling for USPIS on all of Mort's claims.  Mort appealed that order and, in February 2019, the EEOC affirmed Judge Kruse's decision.

Mort filed this lawsuit in May 2019 bringing one Title VII retaliation claim, one Americans with Disabilities Act (ADA) claim, and one Rehabilitation Act claim.  After Mort dismissed the ADA claim (Claim 2), the case proceeded on just the other two claims.  Dkt. 6, 7.  Mort's Title VII retaliation claim (Claim 1) challenged the decision to place Mort on paid administrative leave (and the failure to give him a performance evaluation while he was on that leave) as alleged retaliation for protected activity.  Dkt. 1 at 16-17.  Mort's Rehabilitation Act claim (Claim 3) challenged the decisions to send Mort for fitness-for-duty examinations and to terminate Mort's employment as discrimination based on a perceived disability.  Dkt. 1 at 20-21.

In December 2020, the Postmaster General filed a Motion to Amend Answer to assert the after-acquired evidence and unclean hands defenses.  Dkt. 36.  That motion was based on evidence that the Postmaster General's counsel had received indicating that Mort had engaged in serious misconduct prior

to his UPSIS employment that he had not disclosed.  Dkt. 36-3.  That misconduct resulted in a determination by an AUSA that Mort was *Giglio*-impaired, a fact that Mort had also failed to disclose to USPIS.  During the meet-and-confer preceding the Motion to Amend Answer, defense counsel explained the basis for the motion and provided Department of Treasury investigation documents to Mort's counsel.  Dkt. 36-3 at 9-10.  The court granted the motion, and the Postmaster General filed a First Amended Answer.  Dkt. 48, 49.

## IV.   EVIDENTIARY AND OTHER ISSUES

The Court has indicated that the jury will resolve factual disputes related to the after-acquired evidence defense.  With regard to when USPIS knew about the after-acquired evidence of misconduct, the Postmaster General submits that there can be no dispute that UPSIS knew about it when its counsel disclosed the misconduct and documentation about it to Mort's counsel in early December 2020.

The parties have filed various motions in limine that remain pending and are scheduled for hearing on August 4, 2022.  *See* Dkt. 99-111.

In his retaliation claim (Claim 1), Mort's complaint alleges as retaliation only that he was placed on paid administrative leave during which he did not receive a performance evaluation.  The complaint does <u>not</u> allege Mort's termination as an adverse action in connection with the retaliation claim.  Dkt. 1 at 16-17.  Accordingly, the Postmaster General's proposed jury instructions for the retaliation claim – like Mort's complaint – include only Mort's placement on administrative leave as the adverse action for the retaliation claim.  During the jury instruction meet and confer, Mort's counsel indicated that he wished to include Mort's termination as an adverse action in the jury instruction for the retaliation claim.  But because Mort's complaint failed to identify termination as an adverse action for the retaliation claim, Mort should not be permitted to pursue that theory now.

## V.   POINTS OF LAW

### A.   Administrative Exhaustion Requirement

To bring a Title VII or Rehabilitation Act claim in federal district court, Mort was required to exhaust administrative remedies, including the requirement that he contact an EEO counselor within 45 days of a claimed adverse action.  42 U.S.C. § 2000e-16(c); 29 C.F.R. §§ 1614.105(a)(1), 1614.106; *Sommatino v. United States*, 255 F.3d 704, 707-10 (9th Cir. 2001); *Cherosky v. Henderson*, 330 F.3d

1243, 1245-46 (9th Cir. 2003); *Leong v. Potter*, 347 F.3d 1117, 1121-22 (9th Cir. 2003).

"'The jurisdictional scope of a Title VII claimant's court action depends upon the scope of both the EEOC charge and the EEOC investigation.'" *Sommatino*, 255 F.3d at 707-08 (quoting *Paige v. California*, 102 F.3d 1035, 1041 (9th Cir. 1996)).

Similarly, substantial compliance with the exhaustion requirement is a jurisdictional prerequisite for claim under the Rehabilitation Act. *See Leong*, 347 F.3d at 1121-22.

Accordingly, a plaintiff cannot pursue a Title VII or Rehabilitation Act claim when the administrative charge brought and investigated does not describe the legal theory with sufficient clarity to notify the agency of the claim, even if the plaintiff did administratively exhaust other claims. *See, e.g.*, *Ong v. Cleland*, 642 F.2d 316, 317-20 (9th Cir. 1981); *id.* at 320 ("The failure to raise an issue administratively subverts the procedures and policies of Title VII and justifies precluding its presentation in federal court.").

### B.    Title VII Retaliation Claim

Though the Supreme Court has yet to rule on the question, courts assume that Title VII of the Civil Rights Act prohibits federal employers from retaliating against an employee for engaging in protected activity, such as opposing, complaining of, or seeking remedies for unlawful workplace discrimination. *See* 42 U.S.C. § 2000e-3(a); *White v. General Services Admin.*, 652 F.2d 913, 916-17 (9th Cir. 1981); *see also Green v. Brennan*, 136 S. Ct. 1769, 1774 n.1 (2016); *Gomez-Perez v. Potter*, 553 U.S. 474, 488 n.4 (2008).

To prevail on his Title VII retaliation claim, Mort has the burden of proving that: (1) he engaged in a protected activity under Title VII; (2) USPIS subjected him to an adverse employment action; and (3) he was subjected to the adverse employment action because of his protected activity. *Westendorf v. W. Coast Contractors of Nevada, Inc.*, 712 F.3d 417, 422 (9th Cir. 2013); *Villiarimo*, 281 F.3d 1054, 1064 (9th Cir. 2002); Ninth Circuit Manual of Model Civil Jury Instructions, Instruction 10.8 (Civil Rights—Title VII—Retaliation—Elements and Burden of Proof).

"Protected activity includes the filing of a charge or a complaint, or providing testimony regarding an employer's alleged unlawful practices, as well as engaging in other activity intended to oppose an employer's discriminatory practices." *Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323

F.3d 1185, 1197 (9th Cir. 2003), *opinion amended on denial of reh'g*, No. 00-35999, 2003 WL 21027351 (9th Cir. May 8, 2003); *see also* 42 U.S.C. § 2000e–3(a) (employer may not discriminate against an employee because he has opposed any practice made unlawful by Title VII or filed a charge or participated in an investigation under Title VII).

An employee is not protected by Title VII when he violates legitimate employer rules, knowingly disobeys orders, disrupts the work environment, willfully interferes with the attainment of his employer's goals, or renders himself unable to fulfill the functions of his employment. *Unt v. Aerospace Corp.*, 765 F.2d 1440, 1446 (9th Cir. 1985); *Smith v. Singer Co.*, 650 F.2d 214, 217 (9th Cir. 1981).

To establish a causal nexus between the alleged adverse action and the plaintiff's protected activity, the plaintiff must show that the decision maker who took the allegedly retaliatory action was aware of the plaintiff's protected activity. *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982).

To rely on temporal proximity to establish causation for a retaliation claim, the adverse employment action "must be 'very close'" to and "follow[] on the heels of" the protected activity. *Clark County School District v. Breeden*, 532 U.S. 268 (2001) (quoting *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001) (citing cases holding that three- and four-month delays were too long)); *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1064-65 (9th Cir. 2002); *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1035 (9th Cir. 2006) (eight-month gap too long); *Manatt v. Bank of America*, 339 F.3d 792, 802 (9th Cir. 2003) (nine months too long).

An adverse action in the retaliation context is one that a reasonable employee would have found materially adverse, meaning that it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern v. White*, 548 U.S. 53 (2006) (internal quotations and citations omitted).

Personal animosity is not the equivalent of discrimination and is not proscribed by Title VII. *McCollum v. Bolger*, 794 F.2d 602, 610 (11th Cir. 1986).

### C.   Rehabilitation Act Disability Discrimination Claim

A Rehabilitation Act regarded-as disability discrimination claim requires Mort to prove that: (1) USPIS regarded him as having a physical or mental impairment, (2) Mort was a qualified individual, and (3) Mort was terminated and sent for a Fitness for Duty examination because USPIS regarded him as

having a physical or mental impairment.  *See Walton v. U.S. Marshals Serv.*, 492 F.3d 998, 1005 (9th Cir. 2007), *superseded by statute on other grounds as stated in*, *Nunies v. HIE Holdings, Inc.*, 908 F.3d 428, 434 (9th Cir. 2018); *Nunies v. HIE Holdings, Inc.*, 908 F.3d 428, 434 (9th Cir. 2018); Ninth Circuit Manual of Model Civil Jury Instructions, Instruction 12.1C (Regarded As Disability—Elements).

The Rehabilitation Act incorporates the Americans with Disabilities Act (the ADA)'s standards of substantive liability.  *Walton v. U.S. Marshals Serv.*, 492 F.3d 998, 1005 (9th Cir. 2007), *superseded by statute on other grounds as stated in*, *Nunies v. HIE Holdings, Inc.*, 908 F.3d 428, 434 (9th Cir. 2018).

To meet his burden of proving that he was a qualified individual at the time of the alleged discrimination, Mort must prove that he had the requisite skill, experience, and education and met the other job-related requirements of the position of United States Postal Inspector.  *Anthony v. Trax Int'l Corp.*, 955 F.3d 1123, 1128 (9th Cir. 2020).

If remarks are offered as evidence of discriminatory intent, they must either be those made by the decision-maker himself or Mort must show a sufficient nexus between the remarks and the decision-maker's subsequent action.  *Vasquez v. County of Los Angeles*, 349 F.3d 634, 640 (9th Cir. 2004). There is not a sufficient nexus between the employee who made a discriminatory statement and the decision-maker's action unless the employee in question is substantially involved in the employment action.  *DeHorney v. Bank of America Nat'l Trust & Sav. Ass'n*, 879 F.2d 459, 468 (9th Cir. 1989).

An adverse employment action in a disparate treatment context is one that "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits."  *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). "A tangible employment action in most cases inflicts direct economic harm.  As a general proposition, only a supervisor, or other person acting with the authority of the company, can cause this sort of injury."  *Id.*

### D.  Pretext

An employee's feelings or subjective beliefs do not qualify as specific and substantial evidence of pretext.  *Schuler v. Chronicle Broadcasting Co.*, 793 F.2d 1010, 1011 (9th Cir. 1986).

To demonstrate that the plaintiff was treated differently than similarly situated individuals, the

plaintiff must be similarly situated to those individuals in all material respects.  *Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006).  Employees who have different job responsibilities and duties or who have different supervisors are not similarly situated.  *Vasquez*, 349 F.3d 634, 641-42 & n.17.

Employees must be similarly situated in "all material respects" to be comparable, not only in their job duties and responsibilities, but also in their conduct.  *Vasquez*, 349 F.3d at 641; *Leong*, 347 F.3d at 1124.

If similarly situated employees outside his protected class were treated in the same manner as Plaintiff, his claim fails.  *Gerdom v. Cont'l Airlines, Inc.*, 692 F.2d 602, 609 (9th Cir. 1982) (en banc); *Snead v. Metro. Prop. & Cas.* Inc. *Co.*, 237 F.3d 1080, 1094 (9th Cir. 2001) ("This evidence also shows that at least one other similarly situated employee (Todd) was treated in a similar manner as Snead, thereby negating any showing of pretext.").

The employer need not prove a non-discriminatory intent, and courts "only require that an employer honestly believed its reason for its actions, even if its reason is foolish or trivial or even baseless."  *Villiarimo v. Aloha Island Air, Inc*. 281 F.3d 1054, 1063 (9th Cir. 2002) (internal quotations and citations omitted).

### E.   Damages

The after-acquired evidence doctrine precludes "an employee from receiving remedies for wrongful discharge if the employer later discovers evidence of wrongdoing that would have led to the employee's termination had the employer known of the misconduct."  *Belling v. DDP Holdings, Inc.*, 2013 WL 12140986, at *4 (C.D. Cal. May 30, 2013).

If an employer shows by a preponderance of the evidence that it would have fired the plaintiff for misconduct that it later discovered, the plaintiff is not entitled to back pay and other remedies after the day that the employer discovered the misconduct.  *O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 761, 764 (9th Cir. 1996).  In addition, any back pay remedy in such cases must account for any further circumstances that affect the legitimate interests of the parties.  *See McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 360 (1995).

Under the doctrine of unclean hands, a party may be denied recovery where the party engaged in "reprehensible conduct in the course of the transaction at issue."  *McKennon*, 513 U.S. at 360.

The doctrine of unclean hands limits the types of remedies that are available to a plaintiff in an employment discrimination case. *See McKennon*, 513 U.S. at 361-62. Remedies such as front pay and reinstatement are inappropriate when the doctrine applies. *See id.*

Neither Title VII nor the Rehabilitation Act provide for a right to have a jury determine the appropriate amount of back pay, which is an equitable remedy that must be awarded by the district court in its discretion. *Lutz v. Glendale Union High School*, 403 F.3d 1061, 1069 (9th Cir. 2005).

The total potential compensatory damages that Mort could recover in this case under Title VII and/or the Rehabilitation Act are limited to $300,000. 42 U.S.C. § 1981a(b)(3). No punitive damages can be recovered from USPIS. 42 U.S.C. § 1981a(b)(1). *See also Tuers v. Runyon*, 950 F. Supp. 284, 285-86 (E.D. Cal. 1996) (Postal Service immune from punitive damages under Title VII and the Rehabilitation Act).

A party who fails to disclose damages calculations during discovery is prohibited from offering evidence on those components of damages during trial and from arguing for a specific dollar amount at trial. *See* Fed. R. Civ. P. 37(c); *Maharaj v. Cal. Bank & Trust*, 288 F.R.D. 458, 463-64 (E.D. Cal. 2013).

To the extent front pay is awarded, it "is intended to be temporary in nature," *Cassino v. Reichhold Chemicals, Inc.*, 817 F.2d 1338, 1347 (9th Cir. 1987), and cannot be used as a windfall to the plaintiff. *See Glenn-Davis v. City of Oakland*, 2008 WL 410239, at *4 (N.D. Cal. Feb. 12, 2008). Front pay periods must be relatively short to avoid making any calculations unduly speculative. See id. at *3 (citing *Peyton v. DiMario*, 287 F.3d 1121, 1128 (D.C. Cir. 2002)).

Any back pay or front pay awards must be offset by the amount of other benefits Mort received, such as unemployment or disability benefits. *See, e.g., McLean v. Runyon*, 222 F.3d 1150, 1155 (9th Cir. 2000); *see Viveros v. Donahoe*, 2012 WL 6021667, at *9 (C.D. Cal. Nov. 30, 2012).

Settlement communications are not admissible to prove the validity or amount of a disputed claim. Fed. R. Evid. 408.

Settlement communications provided after the close of discovery do not satisfy a party's obligation to provide damages calculations in their initial disclosures. *See Torres v. Transguard Ins. Co. of Am., Inc.*, 2015 WL 12592724, at *5 (D. Ariz. July 1, 2015).

---

DEFENDANT POSTMASTER GENERAL'S TRIAL BRIEF

1

2

3                                                                Respectfully submitted,

4                                                                PHILLIP A. TALBERT
                                                                 United States Attorney

5

6    Dated:  August 1, 2022                                By:     */s/ Victoria L. Boesch*
                                                                 VICTORIA L. BOESCH
7                                                                PHILIP A. SCARBOROUGH
                                                                 Assistant United States Attorneys
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT POSTMASTER GENERAL'S TRIAL BRIEF